STATE OF CONNECTICUT *v.* STEVEN M. ASHERMAN
(10160)

PETERS, PARSKEY, GRILLO, HENNESSY and SPADA, Js.

Argued March 8—decision released July 17, 1984

*Maxwell Heiman,* with whom was *William J. Tracy, Jr.,* for the appellant (defendant).

*John M. Massameno,* assistant state's attorney, with whom were *Anne C. Dranginis,* assistant state's attorney, and, on the brief, *Dennis A. Santore,* state's attorney, and *Lisa Sokoloff, James P. Rock* and *James R. Turcotte,* legal interns, for the appellee (state).

PARSKEY, J. The defendant was indicted for the murder of Michael Aranow at the town of New Hartford on July 29, 1978. After a trial to the jury the defendant was convicted of the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55.[1] In his appeal the defendant asserts that the court erred in (1) refusing to suppress a number of items taken from him as a result of an alleged illegal seizure; (2) compelling him to submit to dental impressions and thereafter permitting the use of such impressions for identification purposes; (3) permitting evidence of alleged prior unrelated offenses; (4) restricting the defendant's cross-examination of the state's expert witness; (5) admitting in evidence a set of keys and a piece of hair taken from a key ring; (6) instructing the jury with respect to the offense of manslaughter in the first degree; and (7) refusing to set aside the guilty verdict because of alleged jury misconduct. We have examined each of these claims and find no error.

On the basis of the evidence presented at trial, the jury could have reasonably found the following facts: On a Saturday evening, July 29, 1978, the defendant and the victim, who were both students at the Columbia Medical School, traveled from the victim's family home in

---

[1] "[General Statutes] Sec. 53a-55. MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection; or (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person.

"(b) Manslaughter in the first degree is a class B felony."

Hastings-on-Hudson, New York, to New Hartford, Connecticut, to take a break from work on a school computer project. They arrived in New Hartford at the country estate of the victim's family between 9:00 and 9:30 p.m. As they drove to the Kingdom Game Club, which adjoins the estate, the victim's brother, Philip, noticed the lights of their automobile from the cabin in which he and a friend, Robert Lawrence Lane (Larry Lane), were staying and decided to find out who was entering the property. They drove to the game club and met the defendant and the victim.

The four young men exchanged greetings and introductions, after which the victim told his brother that he and the defendant were going to the lookout at the top of Jones' Mountain and that they might see them later that night at Philip's cabin. Because it was a particularly "buggy" night, Philip offered to them some insect spray. The four parted, but neither the defendant nor the victim went to Philip's cabin later that night.

The defendant and the victim proceeded to walk through the woods about one mile until they reached the lookout. Because the night was so dark, the victim had to lead the defendant by the hand. When they arrived at the lookout some unexplained emotion or circumstance, induced perhaps by a mind-altering drug, led the defendant to slay the victim brutally by stabbing him with a knife over 100 times in the face, back, buttocks and left leg, and slashing his throat. Some of the wounds were inflicted post-mortem. The defendant also bit the victim on the upper left portion of his back, over the scapula.

The defendant then attempted to hide the body by moving it, but succeeded in moving it only five and one-half to six feet. He left the scene, covered with blood, looking for some place where he could wash the blood

off of his clothing. As he walked through the woods, he hid somewhere the knife that he had carried to the scene in a "day pack" and the shirt he was wearing, which was drenched in blood, and came upon a stream or nearby pond, where he attempted to wash the blood from the rest of his clothing. He also smeared silt and dirt all over the front of his jeans.

After day broke, on Sunday morning, he walked down to the home of the victim's uncle, Frank Jones. Jones was awakened at 7:30 a.m. by the defendant's shouts at the front door and the barking of Jones' dogs. Coming to the door in his pajamas, Jones found the defendant, stripped to the waist, clad in blue jeans that were soaking wet. The defendant, who was obviously tense, told Jones that he and the victim had been in the woods when they encountered "two guys with a gun." He had escaped but could not find the victim, and wanted to call the police and the victim's parents right away. Jones, who knew that his nephew was familiar with the woods, wanted to find out more before getting excited and calling the police or the Aranows.

After the defendant mentioned the victim's name, Jones let him into the house. The defendant asked for a drink of water and asked also if he could wash his hands, which he was permitted to do at the kitchen sink. Jones noted that, while the defendant wore no shirt, he had no bruises or insect bites anywhere on the exposed part of his body. He could also observe that the defendant appeared to be on drugs or to have been drinking. In response to Jones' question about the matter, the defendant said that he thought he and the victim had had a couple of beers.

The defendant went on to tell Jones that the night before, he and the victim were walking to a place on the top of the mountain, where there was a view, when they were approached by two drunken men, one of

whom had a gun. According to the defendant, the men asked the victim and him for something, after which the defendant shoved the man with the gun into the other, and he and the victim ran off into the woods.

Jones and the defendant then proceeded in Jones' automobile up Steele Road and onto Henderson Road to Philip Aranow's cabin in order to see if Michael was there. At the cabin, the defendant requested and was given a shirt to wear. He began to give additional details about what had happened the night before, saying that he had seen the flash of a knife one of the men had; that one of the men chased him through the woods for a long time; and that his shirt had been lost as he ran through the woods. The defendant kept repeating that they should call the police. He then went by car with Philip Aranow and Larry Lane to the victim's car and the Kingdom Game Club. Having parked Philip's car on the road to the lookout, they proceeded on foot towards the lookout. Jones had taken his car and gone back down Henderson Road and Steele Road to his home and then up the mountain from the opposite direction.

As the three young men approached the lookout, the defendant, who had been calling out for the victim, fell back from the other two. Jones approached from the other direction and saw the body of the victim lying face down at the lookout. He approached the body while the three young men remained on the dirt road, tried to find a vital sign, and, when he did not, told the others that Michael was dead. Frank Jones left the three young men near the lookout as he went to call the police.

Trooper Joseph Bieluch was the first officer to arrive and hear the defendant's explanation. He noted that the defendant's jeans were extremely dirty and wet, as if smeared with silt from a pond. His jogging shoes

were also wet, though his hands and arms were clean. He was wearing his glasses and had no apparent bug bites, scratches or cuts. He had a red substance in the corners of his mouth, which appeared to be blood, and Bieluch detected the foul smell of rancid blood. The trooper believed that the defendant was under the influence of something.

Later, the three young men went down to the Jones' residence to give statements to the police. The defendant was interviewed by Trooper Calkins. He stated that, after he and Michael had left Philip and Larry, they walked about one-half hour into the woods when suddenly they were confronted by two men before they reached the lookout. He said that these men "just appeared right in front of them." Yet, the only description he could give of them was their relative height. He assumed that they were males by their voices, about which there was nothing unusual. He said the shorter of the two was carrying a long gun, and the taller had something in his hand that "glinted." Their breath smelled of alcohol. He said the two men made a demand of some kind for their belongings and that he suddenly pushed the smaller of the two into the other and ran off with Michael. Almost immediately, they became separated. He said he ran in the woods for about one-half hour before he stopped to rest, when he heard what sounded like a gunshot. Neither Philip nor Larry heard any gunshots or other strange sounds during the evening. The defendant also told Trooper Calkins that, while running through the woods, he had lost his "day pack" and his shirt had been ripped off of his body by the branches and brush.

Later, the defendant was asked to reduce his statement to writing at the New Hartford Town Hall. There, Troopers Robert Terry and Richard Raposa saw spots on the defendant's blue jeans that appeared to be blood. When asked to empty his pockets, the defendant pro-

duced a key ring on which a red hair, similar to the victim's, was embedded in blood. The defendant, who was surprised to see the blood and hair, wanted to know how long it would take the lab to determine whether or not it was blood. When Sergeant Henry DesChamps later asked the defendant to describe his assailants, he merely shrugged his shoulders and gave no answer.

During the interview at Town Hall, Sergeant DesChamps asked the defendant if he had killed the victim. The defendant paused for a few moments and, looking down, said "no." Before he left the New Hartford Town Hall, he shook hands with DesChamps, thanked him for the way he had treated him, and promised to come back some day and tell him what had happened on the hill.

The investigation of the scene began upon discovery of the body and continued for a number of days thereafter. An expert in crime scene analysis testified that there was no sign of a struggle on the small path leading to the lookout or at the nearby road, but that there was a primary and secondary crime scene at the lookout, and that the body had been lifted five and one-half to six feet from the primary to the secondary scene. He also stated that there would have been no way for two men to drag or otherwise force the victim onto the lookout over the small path without creating some disturbance to the path or the vegetation surrounding it.

Expert dog track evidence was presented by Trooper Andrew Rebmann who handled the bloodhound "Clem." An American Kennel Club registered bloodhound, Clem had been cited for tracking a person who had been missing for eight days and another young girl, found alive after being missing for three days. Clem acquired the scent of the victim from his shoe and tracked him, with a good strong pull, from the Kingdom Game Club (where his car was parked) along the dirt roads leading

to the lookout. Without variation, Clem went directly to the lookout, circled at a pool of scent of the victim and stopped. The track demonstrated that the victim had never run from any assailant, but proceeded directly to the lookout.

A wide-ranging search of Jones' Mountain by the state police and over one hundred volunteers with metal detectors, failed to yield evidence of a ripped shirt, day pack, spent gun shells or any other evidence that would substantiate the defendant's story. All the ponds were searched by Connecticut state police divers without yielding evidence of the crime.

The mountain, as depicted in state's exhibits A, D, X, and Y, was a rugged area of deep, thick woods and full underbrush.

Agent Robert Spalding, of the FBI laboratory, testified that human blood was found in the knees and surrounding front area of the defendant's blue jeans and was especially apparent on the front inside portion of the jeans. The blood stain covered a surface of 12″ x 8″ on the front of the right leg and 9″ x 5″ on the front of the left leg. No further tests could be done, however, because of the dirt embedded in the fabric and the fact that the blood had been diluted by water.

Other expert testimony indicated that the hair on the key ring originated from the head of the victim and had been embedded in human blood on the defendant's key ring. Finally, Dr. Lester Luntz, a forensic odontologist, testified, after exhaustive comparative analysis that, to a "reasonable degree of dental certainty," the bite mark on the victim's back had been inflicted by the defendant's teeth.

On the basis of this evidence, the defendant was convicted of manslaughter in the first degree; General

Statutes § 53a-55; and was sentenced thereon to a prison term of not less than seven years nor more than fourteen.

## I

### PROBABLE CAUSE TO SEIZE ON JONES' MOUNTAIN

The defendant claims that he was illegally seized by Trooper Bieluch while the two of them were at the top of Jones' Mountain and that since Bieluch had insufficient probable cause to make a warrantless arrest at that point any statements or items of personal property taken from him incidental to such arrest were illegally seized in violation of the fourth and fourteenth amendments to the United States constitution. If, in fact, the defendant was seized in a constitutional sense at that point, in the absence of probable cause, such seizure would be unreasonable within the meaning of the fourth amendment; *Dunaway* v. *New York,* 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); and under article first, § 7 of the Connecticut constitution; *State* v. *Ostroski,* 186 Conn. 287, 290, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982); and the fruit of such seizure, whether consisting of oral statements; *Wong Sun* v. *United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); or personal property; *State* v. *Federici,* 179 Conn. 46, 53, 425 A.2d 916 (1979); would be subject to suppression.

It is not at all clear that the defendant was seized in a constitutional sense by Trooper Bieluch on Jones' Mountain. The trial court observed that Bieluch had a right to preserve the scene where the body was found. To the extent that this observation suggests a murder scene exception to the constitutional requirements respecting search and seizure no such exception is recognized. *Mincey* v. *Arizona,* 437 U.S. 385, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). Nevertheless, the situa-

tion in which Bieluch found himself at the murder scene is not totally irrelevant to the question of whether the defendant was detained on Jones' Mountain.

If Trooper Bieluch had probable cause to arrest the defendant at the lookout on Jones' Mountain then any articles seized from him incidental to that arrest would not be subject to suppression on fourth amendment grounds. *State* v. *Penland,* 174 Conn. 153, 155, 384 A.2d 356, cert. denied, 436 U.S. 906, 98 S. Ct. 2237, 56 L. Ed. 2d 404 (1978). Probable cause means more than mere suspicion. There must be facts and circumstances within the officer's knowledge, and of which he has trustworthy information, sufficient to justify the belief of a reasonable person that a felony has been committed and that the person subject to being arrested has committed it. *State* v. *Acklin,* 171 Conn. 105, 113, 368 A.2d 212 (1976). If probable cause to arrest exists, whether the officer intended to arrest at that point is of no consequence. *State* v. *Carter,* 189 Conn. 611, 619, 458 A.2d 369 (1983). Because our consideration of the probable cause issue is dispositive of the trial court's ruling on the motion to suppress we need not consider whether the defendant was in fact seized at the lookout and if so whether his detention could be justified on the basis of something less than probable cause, namely, an articulable suspicion. See *United States* v. *Mendenhall,* 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497, reh. denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1138 (1980).

The facts pertinent to the seizure issue are the following: At approximately 8:25 on the morning of July 30, 1978, Trooper Bieluch of the Connecticut state police received a call in his office at the Town Hall in New Hartford from Frank Jones advising him that there had been a murder on Jones' Mountain. Jones, who is part owner of a large country estate in New Hartford, informed Bieluch that he had discovered on

the mountain the body of his nephew and related some sketchy details of what he knew of the incident. He stated that his nephew and a friend had been camping out on the mountain when they were accosted by two intoxicated people; the friend ran away and, in the morning, came to the Jones' house telling Jones what had happened and that he could not find Michael. They later discovered Michael's body.

Trooper Bieluch, who arrived at the Jones' home at around 8:30 a.m., picked up Jones and proceeded with him to the lookout, which is located near the top of Jones' Mountain and about 1.4 miles from the Jones' residence. The gravel road to the lookout is surrounded on both sides by woods and dense brush. When they arrived at the lookout they met Philip Aranow, the victim's brother, Larry Lane, a friend of Philip's, and Steven Asherman, the defendant. Bieluch saw the body of the victim, which had multiple stab wounds and was surrounded by large amounts of blood.

The trooper then proceeded to interview those who were present. He began with Philip Aranow who told him that on the previous evening he and Lane had been at the Aranow cabin, which is on the same road that leads to the lookout, when the victim and the defendant arrived on the property. After speaking briefly with them at the Kingdom Game Club, the victim and the defendant both left. At around 7:30 the next morning, his uncle, Jones, and the defendant arrived, reported to him that his brother Michael was missing, and asked him to help in the effort to find him. Lane, who was interviewed next, confirmed the account given by Philip Aranow.

Trooper Bieluch then asked the defendant what had happened. The defendant responded by saying that the night before he and the victim were walking on the road toward the lookout when they were met by two intoxi-

cated men, one of whom, he thought, was carrying a shotgun of some kind. After these two men began antagonizing and intimidating the victim and him, he pushed one of the men into the other and ran off into the brush and hid for awhile. He later resumed running through the woods, after which he stopped and fell asleep. When he awoke it was daylight, and, although he did not know where he was, he proceeded down the mountain where he came upon the home of Frank Jones. When Jones came to the door in response to the defendant's knocking, the defendant related to him the same account of what had occurred.

As the defendant was speaking, the trooper noticed several things about his appearance: He was looking down at the ground all of the time. His blue jean pants and shoes were wet and extremely soiled. The pants looked as if somebody had deliberately rubbed silt from a pond or stream on them. The entire front and sides of the pants were covered with silt while the rest of his body was very clean. The defendant was wearing glasses, which were clean and had no device to hold them in place, and he did not have any visible scratch marks or insect bite marks.

As the interview continued, these facts combined to raise in the trooper's mind serious doubts about the truthfulness of the defendant's story given the density of the brush in the area, the number of insects, and the obvious fact that whoever perpetrated the killing would probably be covered with blood or would have attempted to wash it out of his clothing or discard any stained clothing. Moreover, Bieluch also observed what, from his training and substantial experience, appeared to be dried blood caked on the corners of the defendant's mouth and detected from his mouth the foul odor of rancid blood. Finally, Bieluch observed that the defendant, who was incoherent at times and unsure of his answers to questions, appeared to be under the influ-

ence of some mind-altering drug, the symptoms of which he had seen on numerous occasions. That fact, of course, would have been consistent with the unexplained brutality of the slaying.

At this point the defendant began asking the trooper if he could go down to the Jones' house to take a shower. Trooper Bieluch advised him that he would prefer that he not leave because certain things needed to be done at the scene and that he wanted him to remain there until troopers from the Canaan barracks would arrive. The defendant, who agreed to remain, went on to respond to questions from Bieluch concerning the details of his account. When asked about his shirt, he said that it had been ripped off by the branches as he was running through the brush and that he did not know where it was.

Trooper Bieluch then asked Jones to recount what had happened. He reiterated that the defendant had come to his home that morning reporting that there had been trouble on the hill and that he could not find Michael. Jones had not been particularly concerned since he knew that the victim was familiar with the woods. Jones went on to state that when the defendant arrived at his home he was wearing no shirt and that Philip Aranow and Lane had supplied him with the yellow shirt he was then wearing.

When the defendant asked again if he could go to the Jones' house and take a shower, Trooper Bieluch suggested that he could take the defendant to the house where he could have a cup of coffee. Again, the trooper, who had substantial doubts about the veracity of the defendant's story, was concerned about alteration of the crime scene or any potential evidence before the arrival of the investigative team from Canaan and the major crime squad. The trooper, Jones and the defendant left the scene of the homicide at around 9:30 a.m.

and drove to the Jones' home in the trooper's cruiser, meeting as they arrived simultaneously three troopers from the Canaan barracks. The defendant exited the cruiser and walked across the lawn and entered the Jones' home as Bieluch began briefing Sergeant Timmons, in Trooper Calkins' presence, on what had occurred prior to his arrival. Timmons then assigned Troopers Bieluch and Bernstein, who had arrived with him, to guard the scene of the crime. They both went to the scene after which Bieluch brought Philip Aranow and Lane down to the Jones' residence. In the meantime Lieutenant Smith, commander of the Canaan barracks, and Trooper John McGoldrick arrived. Troopers Bieluch, Calkins and McGoldrick were then assigned to interview individually the witnesses Aranow, the defendant, and Lane, respectively. Bieluch gathered all three witnesses together on the closed-in porch of the home and advised them all together of their *Miranda* rights. When he asked them whether they understood their rights each one individually indicated that he was fully aware of his rights. The individual interviews then began.

There was sufficient probable cause to justify the defendant's seizure on Jones' Mountain. Thus there was no fourth amendment basis for suppressing any of the evidence obtained from him. The following information was available to Bieluch at the time he requested the defendant to remain at the scene: the victim's body was lying face down next to a pool of blood and the defendant was the last person known to have been with the victim before his death. The person who killed the victim would probably have been covered with blood as a result of the method of killing. The defendant was wearing blue jeans that were wet and soiled in front with what appeared to be silt from a nearby pond and stream. The silt appeared to have been deliberately rubbed into the pants. The remainder of the defend-

ant's body was very clean, except that what appeared to be dried blood was caked on the corners of the defendant's mouth. The foul odor of rancid blood was detected on the defendant's breath. The defendant, who claimed to have been running and stumbling through dense forest throughout a black midsummer night, nevertheless had no visible scratch marks or insect bite marks on his body. There were also no scratch marks on the glasses he was wearing. During the interview the defendant would not look at Bieluch but instead kept looking at the ground. The defendant appeared to be under the influence of some kind of mind altering drug, a possible explanation for the brutality of the crime. Viewing this information in its totality, Bieluch had reasonable grounds to believe that the defendant had committed the murder.

## II

### RULINGS ON EVIDENCE

### A

#### USE OF DENTAL IMPRESSIONS

On motion of the state, Practice Book, 1963, § 2186 et seq. (now § 775 et seq.), the defendant, pursuant to court order, was compelled to permit the taking of wax impressions and photographs of his teeth. The defendant claims that the taking of these impressions and photographs violated his right, under article first, § 8 of the Connecticut constitution, not to give evidence against himself. The defendant asserts further that the use of such evidence by the state's dental expert constituted an impermissible identification procedure in violation of the due process clause of the fourteenth amendment to the United States constitution and that, in any event, the state's dental expert should not have been permitted to give an opinion concerning the probability that

the bite mark on the shoulder blade of the victim was made by the defendant because there was no factual basis for such opinion.

### (1)
### Connecticut's Privilege of Self-Incrimination

Article first, § 8 of the Connecticut constitution provides in part: "No person shall be compelled to give evidence against himself . . . ." The defendant points to the language of the fifth amendment to the federal constitution which reads that "[no person] shall be compelled . . . to be a witness against himself" and argues that because of the difference in language the protection afforded by the state constitution is broader and that by the use of the word "evidence" the state constitution was intended to cover both testimonial and nontestimonial evidence. We disagree.

The privilege against self-incrimination embodied in article first, § 8 has its genesis in the common law. Historically the privilege became part of the common law because of the experience with the oath ex officio as used originally in the ecclesiastical courts and later in the Court of the Star Chamber. 8 Wigmore, Evidence (McNaughton Rev.) § 2250. The seemingly innocuous oath which bound a person under examination to make a true answer to all questions that might be asked was used to force him to destroy himself by his own testimony. If his compelled testimony convicted him, he was punished. If he refused to take the oath, he was subjected to torture. Finally, when John Lilburn in 1637 refused to take the oath ex officio in the Star Chamber and received parliamentary support in his refusal, the principle embodied in the Latin phrase nemo tenetur seipsum accusare (no one is bound to accuse himself) had its origins and ultimately came to be accepted in the common law courts. McCormick, Evidence (2d Ed.) § 114. At common law the privilege protected against

any activity performed for the purpose of communicating. Id., § 124. Noncommunicative evidence such as fingerprints or photographs was not included within the privilege. The purpose of incorporating the privilege in our state constitution was to place this right as it was known at common law beyond legislative abolition. *State* v. *Torello,* 103 Conn. 511, 513, 131 A. 429 (1925).

The defendant argues that the difference in language between article first, § 8 of the state constitution ("[n]o person shall be compelled to give evidence against himself") and the fifth amendment of the federal constitution ("[no person] shall be compelled . . . to be a witness against himself") suggests that the two provisions should not receive the same construction. The thrust of his argument is that being a witness generally refers to giving testimony whereas giving evidence includes both testimonial and nontestimonial material. Our cases, while not focusing on the linguistic differences nevertheless have not drawn the suggested distinction. Cf. *State* v. *Anonymous (1976-2),* 32 Conn. Sup. 306, 311, 353 A.2d 789 (1976). We have approved, for example, the admission of a photograph taken of the accused; *State* v. *Hackett,* 182 Conn. 511, 516, 438 A.2d 726 (1980); the taking of paraffin casts of a defendant's hands; *State* v. *Chesney,* 166 Conn. 630, 640, 353 A.2d 783, cert. denied, 419 U.S. 1004, 95 S. Ct. 324, 42 L. Ed. 2d 280 (1974); the seizure of mud-stained shoes to compare with a plaster cast of a footprint; *State* v. *Smith,* 156 Conn. 378, 383, 242 A.2d 763 (1968); the introduction in evidence of the defendant's blood stained shoes; *State* v. *Hassett,* 155 Conn. 225, 232, 230 A.2d 553 (1967); and the use of fingerprints. *State* v. *Chin Lung,* 106 Conn. 701, 723, 139 A. 91 (1927).

We have construed the state constitutional privilege as being declaratory of the common law. *State* v. *Monahan,* 96 Conn. 289, 290, 114 A. 102 (1921). "The common-law maxim *nemo tenetur seipsum accusare* has

been incorporated in the constitutions of nearly every State and appears in our Declaration of Rights in the provision that an accused 'shall not be compelled to give evidence against himself.' Conn. Const., Article First, § 9 [now § 8]. The history of the development of the privilege discloses that the object sought to be attained thereby was the prevention of the employment of legal process to extract from the person's own lips an admission of his guilt which would then take the place of evidence." *State* v. *Ford,* 109 Conn. 490, 496, 146 A. 828 (1929). We have also noted that compulsion which makes a suspect or accused the source of real or physical evidence has been held not to violate a person's constitutional rights as it is not such as compels "communications" or "testimony"; *State* v. *Chesney,* supra; and in this respect we cited the following examples. *Cupp* v. *Murphy,* 412 U.S. 291, 93 S. Ct. 2000, 36 L. Ed. 2d 900 (1973) (taking scrapings from fingernails over protest); *Gilbert* v. *California,* 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967); *United States* v. *Wade,* 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967) (compelling a demonstration of the accused's voice); *Schmerber* v. *California,* 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966) (withdrawing blood sample).

In our most recent discussion of the constitutional privilege against self-incrimination we made the following observation: "Judicial review of an asserted invasion of the protection against compelled self-incrimination must focus on whether the state (1) actually compelled the claimant to disclose (2) *testimonial* communications (3) which tended to incriminate him." (Emphasis added.) *State* v. *Smith,* 185 Conn. 63, 83, 441 A.2d 84 (1981). And in *State* v. *Acquin,* 187 Conn. 647, 678 n.15, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983), we noted that compelling an accused to drop his pants so as to expose non-

testimonial scratches on his thigh would not violate his constitutional rights. Thus, if there is a constitutional distinction to be drawn in self-incrimination cases between giving testimony and giving evidence, our cases have not reflected it. *State* v. *Anonymous (1976-2), supra.*

Seventeen states[2] have language in their constitutions comparable to the "giving evidence" language in article first, § 8. None of these states[3] has construed this phrase as excluding all nontestimonial evidence. Utah, which construes its provision as broader than the federal counterpart, would preclude compelling an accused to give a handwriting sample because that would require a defendant to perform an affirmative act. *Hansen* v. *Owens,* 619 P.2d 315 (Utah 1980); accord

[2] Alabama (Ala. Const., Art. I § 6); Arizona (Ariz. Const., Art. II § 10); Delaware (Del. Const., Art. I § 7); Illinois (Ill. Const., Art. I § 10); Kentucky (Ky. Const., § 11); Maine (Me. Const., Art. I § 6); Maryland (Md. Decl. of Rights, Art. 22); Mississippi (Miss. Const., Art. III § 26); Nebraska (Neb. Const., Art. I § 12); North Carolina (N.C. Const., Art. I § 23); Pennsylvania (Pa. Const., Art. I § 9); South Dakota (S.D. Const., Art. VI § 9); Tennessee (Tenn. Const., Art. I § 9); Texas (Tex. Const., Art. I § 10); Utah (Utah Const., Art. I § 12); Vermont (Vt. Const., Ch. I, Art. X); Washington (Wash. Const., Art. I § 9).

[3] See, e.g., *Hill* v. *State,* 366 So. 2d 318, 322 (Ala. 1979); *State* v. *White,* 102 Ariz. 162, 426 P.2d 796 (1967); *State* v. *Smith,* 47 Del. Super. Ct. 334, 91 A.2d 188 (1952); *People* v. *Schmoll,* 77 Ill. App. 3d 762, 396 N.E.2d 634 (1979), cert. denied, 447 U.S. 928, 100 S. Ct. 3026, 65 L. Ed. 2d 1122 (1980); *Newman* v. *Stinson,* 489 S.W.2d 826, 829 (Ky. 1972); *State* v. *O'Conner,* 320 So. 2d 188 (La. 1975); *State* v. *Buzynski,* 330 A.2d 422 (Me. 1974); *Reed* v. *State,* 35 Md. App. 472, 372 A.2d 243 (1977); *McCrory* v. *State,* 342 So. 2d 897 (Miss. 1971); *State* v. *Swayze,* 197 Neb. 149, 247 N.W.2d 440 (1976); *Wyman* v. *DeGregory,* 101 N.H. 171, 137 A.2d 512 (1957) (preserves common-law privilege); *State* v. *Strickland,* 276 N.C. 253, 260, 173 S.E.2d 129 (1970); *State* v. *Thomason,* 538 P.2d 1080, 1081–86 (Okla. Crim. App. 1975) (state constitution adopted privilege as at common law); *Commonwealth* v. *Moss,* 233 Pa. Super. 541, 334 A.2d 777 (1975); *Delk* v. *State,* 590 S.W.2d 435, 440 (Tenn. 1979); *Olson* v. *State,* 484 S.W.2d 756, 772 (Tex. Crim. App. 1972) (opinion on rehearing) ("evidence" self-incrimination clause merely reflective of common-law privilege); *State* v. *Picknell,* 142 Vt. 215, 454 A.2d 711 (1982); *Artis* v. *Commonwealth,* 213 Va. 220, 191 S.E.2d 190 (1972); *State* v. *Foster,* 91 Wash. 2d 466, 589 P.2d 789 (1979).

*Creamer* v. *State,* 229 Ga. 511, 192 S.E.2d 350 (1972). Utah would not preclude the use of a hair sample because that does not require an affirmative act. *State* v. *Van Dam,* 554 P.2d 1324 (Utah 1976). For our part, we agree with the observation that "there is really, in spirit and in principle, no distinction arising out of such difference of language." *Counselman* v. *Hitchcock,* 142 U.S. 547, 586, 12 S. Ct. 195, 35 L. Ed. 1110 (1892). We hold that compelling the defendant to submit to the taking of a dental impression did not violate article first, § 8 of the Connecticut constitution.

### (2)

### Dental Impression—Due Process

The defendant objected to the state's motion permitting it to take a dental impression of the defendant on the additional ground that the procedure violated the defendant's rights to due process in that it permitted the state to identify the defendant by means of an impermissibly suggestive procedure. The defendant's claim is that by permitting Dr. Luntz, the state's expert, to compare the teeth of the defendant with the bite mark on the victim's body, when Luntz knew the defendant was the accused, the court permitted an impermissibly suggestive identification procedure. This claim is without merit.

Expert testimony is used in a variety of situations such as a comparison of fingerprints, voiceprints and bite marks. The state correctly observes that the defendant's analogy to eyewitness identification is misconceived. *"Wade [United States* v. *Wade,* 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967)] and *Gilbert* [*Gilbert* v. *California,* 388 U.S. 263, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967)] fashion exclusionary rules to deter law enforcement authorities from exhibiting an accused to witnesses before trial for identification purposes without notice to and in the absence of counsel.

A conviction which rests on a mistaken identification is a gross miscarriage of justice. The *Wade* and *Gilbert* rules are aimed at minimizing that possibility by preventing the unfairness at the pretrial confrontation that experience has proved can occur and assuring meaningful examination of the identification witness' testimony at trial." *Stovall* v. *Denno,* 388 U.S. 293, 297, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). There are substantial differences between the problems faced by an accused when confronted by identification procedures utilized by law enforcement authorities with respect to eyewitnesses and any problems which may arise from a systematized or scientific analysis of the accused's fingerprints, blood sample, clothing, hair and the like. "Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts." *United States* v. *Wade,* supra, 227–28.

### (3)

### Factual Basis for Dr. Luntz's Opinion

The defendant claims that the testimony of Luntz was inadmissible because there was no way of knowing the precise position of the victim's scapula at the time the bite was inflicted. We disagree.

In order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. The trial court has a wide discretion in ruling on the admissibility of expert testimony and the exercise of this discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law. *Going* v. *Pagani,* 172 Conn. 29, 35, 372 A.2d 516 (1976). Where the fac-

tual basis of an opinion is challenged the question before the court is whether the uncertainties in the essential facts on which the opinion is predicated are such as to make an opinion based on them without substantial value. *Berndston* v. *Annino,* 177 Conn. 41, 46, 411 A.2d 36 (1979); *Sears* v. *Curtis,* 147 Conn. 311, 314–15, 160 A.2d 742 (1960). The question is not whether the opinion would be more or less persuasive depending on the presence or absence of a given fact but rather whether the missing fact is such an essential part of the factual foundation for the opinion that its absence would rob the opinion of its persuasive force. *Maroncelli* v. *Starkweather,* 104 Conn. 419, 424, 133 A. 209 (1926).

Luntz believed that a meaningful comparison could be made between the photographs of the bite mark and the photographs and models of the defendant's teeth. He testified that after viewing the photographs that showed the bite mark he obtained life size enlargements of them. He then took impressions of the defendant's dentition and made corresponding models. He photographed the defendant's teeth and took special scan photographs inside the defendant's mouth. He then created a "mirror image" photograph of the defendant's teeth to aid the jury in comparing the bite mark photograph with the photograph of the defendant's teeth. He then conducted bite mark experiments involving the scapula, over which the skin that was bitten was located. He examined the photographs and models for the purpose of discerning the unique characteristics of the defendant's dentition and comparing those characteristics with the photographs of the bite mark.

Luntz observed from the photograph of the bite mark that there was no impression made by the biter's tooth number nine (left frontal incisor). He also noted that while teeth numbers four, seven and eight left distinct marks, tooth number nine left none and teeth numbers ten and eleven left only faint marks. He concluded that,

because every other available point of comparison between the bite mark and the defendant's dentition matched and the mark evidenced a variation of pressure on imprint, the mark was produced while the scapula was located so as to create pressure under teeth numbers four, six, seven and eight but not under nine. Although Luntz could not testify with certainty as to the precise position of the scapula at the time of the bite, this circumstance did not render his opinion inadmissible. Assuming that the position of the scapula at the time of the bite was a significant factor in making a bite mark comparison, the fact that in this case the position was unknown or unknowable would go the weight of Luntz's opinion and not to its admissibility.

## B

### RESTRICTIONS ON CROSS-EXAMINATION OF STATE'S EXPERTS

The defendant claims that the trial court erred in limiting his cross-examination of Luntz. Specifically the defendant asserts that he was denied an opportunity to inquire respecting Luntz's hobby of collecting a variety of police accouterments and that he was further denied the opportunity to demonstrate that on another occasion his opinion concerning bite mark identification turned out to be erroneous.

"The right of an accused to effectively cross-examine an adverse witness is embodied in the confrontation clause of the sixth amendment. *Davis* v. *Alaska,* 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Douglas* v. *Alabama,* 380 U.S. 415, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965). . . . The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment." *State* v. *Gaynor,* 182

Conn. 501, 508, 438 A.2d 749 (1980). Therefore, the threshold question is whether the cross-examination of Luntz accorded to defense counsel at trial satisfied the principle enunciated in *Davis* v. *Alaska,* supra.

The defendant's avowed purpose for the inquiry into Luntz's hobby was to show his close relationship to law enforcement authorities. This inquiry cannot be examined in a vacuum. Prior to this inquiry the defendant had elicited ample evidence of Luntz's relationship with law enforcement agencies which rendered this testimony cumulative. After Luntz had testified, as part of his qualification, that he had been appointed as a Connecticut state police surgeon in 1963 and currently held this position with the rank of captain, the defendant elicited on cross-examination testimony concerning Luntz's initial involvement with the state police, his private socializing with police and attendance at police social functions and his receipt of a gift from the police department. In the light of the elicited information the additional inquiry was not only cumulative but was also of questionable relevance and, in any event, in context amounted to nothing more than evidential fluff.

Irving M. Sopher, chief medical examiner for the state of West Virginia and a forensic pathologist and odontologist, testified for the state as an expert rebuttal witness. On cross-examination the defendant sought to inquire if he and Luntz had testified in the same cases, if Luntz had referred work to him, and if he had seen Luntz over the lunch break. Upon objection all of these questions were excluded. The defendant claimed that he had a right to show the relationship of these witnesses to each other and how that relationship may affect their judgment.

Bias may consist of a friendly feeling or of hostility. It may be shown in a variety of ways. Implied bias may be shown by the relationship of a witness to a party;

this may also include an intimate family relationship to a person other than a party. 3A Wigmore, Evidence (Chadbourn Rev.) § 949. Social and business relationships depending on their nature or character, may also have a tendency to show bias. When the issue involves the relationship between a witness and a party, cross-examination of the witness to demonstrate this relationship is a matter of right which may not be unduly restricted. *Alford* v. *United States,* 282 U.S. 687, 51 S. Ct. 218, 75 L. Ed. 624 (1931). This may also be true in many cases involving the relationship of witnesses to each other. Under the peculiar facts of this case, however, the matter involved the exercise of discretion.

Although Luntz and Sopher were both on the prosecution team their roles were different. Luntz supported the prosecution theory that the defendant had perpetrated the homicide by identifying the bite mark on the victim's shoulder blade as having been made by the defendant. Sopher's testimony, on the other hand, was offered to rebut the testimony of the defendant's experts, the main thrust of which was that the defendant's teeth could not have produced the bite mark in question. It was Sopher's opinion that the defendant could not be excluded as the biter. Upon objection by the defendant Sopher was precluded from testifying whether in his opinion the defendant had actually bitten the decedent.

The defendant's claim was that Luntz and Sopher were part of the same team and that as such one tended to testify consistently with the other. That being so, the defendant argues, he had a right to show the social and business relationship that may have played a role in producing this symbiotic testimonial result. Had Sopher supported Luntz's opinion that the bite mark had been caused by the defendant there is no question but that it would have been appropriate for the defendant to have shown the social and business relationship

between the two in relation to their joint testimony in this and other cases. Even in this case where the testimonial connection is more attenuated, the trial court would have been well advised to have exercised its discretion in favor of permitting the inquiry. But on the facts of this case we cannot conclude that the ruling constituted an abuse of the court's discretion. In Luntz's opinion the evidence ruled the defendant in. In Sopher's opinion the evidence did not rule the defendant out. Although in a general sense Sopher's testimony supports Luntz it is much too oblique to warrant as a matter of right the implied bias inquiry based on the relationship of the two expert witnesses.

In determining whether the cross-examination of Sopher was unduly restricted it is the entire cross-examination which we must examine. *State* v. *Wilson,* 188 Conn. 715, 720, 453 A.2d 765 (1982). When the examination is measured against this standard we cannot conclude that the defendant's rights were violated. The examination of Sopher's qualifications covered more than twenty-nine pages of transcript and covered such matters as Sopher's knowledge of bite mark analysis techniques, the extent to which he had been informed about other witness' testimony, the accuracy of the molds and photographs he had prepared and the accuracy of his analysis generally. He was also confronted with his own testimony in an Illinois case in which both he and Luntz had testified for the prosecution, testimony which appeared to contradict views he was expressing in the case on trial. The defendant on cross-examination was permitted to paint a sufficient picture of Sopher so as to permit the jury to pass on his credibility.

### III

#### HAIR AND BLOOD SAMPLES

The trial court admitted into evidence a strand of hair which had been removed from the defendant's key

ring.[4] At the time of seizure, what appeared to be blood was found on the strand of hair and on the key ring. Agent Michael Malone of the FBI laboratory, an expert in the examination of hair and fibers, identified the hair as being that of the victim on the basis of twenty characteristics which matched the known hair of the victim. The amounts of blood on both the key ring and the hair were too small for complete analysis. The blood on the key ring was identified as human blood but could not be typed. The blood on the hair could not be otherwise identified. Both blood samples were entirely consumed in testing.

The defendant moved to strike the hair and key ring exhibits and the testimony relating thereto on the grounds that there had been material alteration in the exhibits from the time of seizure and that the consumption of the blood sample during testing was prejudicial to the defendant because it deprived him of an opportunity to defeat the inference that the hair was deposited on the key ring at the time of Michael Aranow's death.

## A

### ALTERATION OF EVIDENCE

When proffered evidence is challenged on the ground of material alteration, the trial court must satisfy itself in reasonable probability that the substance has not been changed in important respects. The trial court, in making its determination, must consider the nature of the article, the circumstances surrounding its preservation and custody and the likelihood of intermeddlers tampering with it. In the absence of a clear abuse of discretion the ruling of the trial court admitting the evidence must stand. *State* v. *Piskorski,* 177 Conn. 677, 697, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979).

---

[4] State's Exhibit JJJ consists of a rectangular key ring and a set of 12 keys.

The defendant claims that the hair which was received by Malone at the FBI laboratory was changed in that it was broken at the proximal end, that is, the side near the scalp. Malone, a hair and fiber expert, testified that he received the hair in a sealed package which contained a key ring and set of keys wrapped in a piece of paper. He removed the items from the package and upon examination noted that a hair fragment was embedded in encrusted blood on a key ring.[5] Despite its broken condition, Malone was able to test the hair and to identify twenty matching characteristics between the hair fragment and the known hair of the victim. In the absence of a showing that the broken condition of the hair sample would have destroyed or distorted its use for identification purposes, there was no basis for its exclusion as evidence.

## B

### CONSUMPTION OF BLOOD SAMPLES BY TESTING

The defendant argues that the trial court erred in denying his motion to strike evidence relating to blood found on the key ring and hair. His claim is that the test which culminated in establishing the substance as blood also consumed the entire substance discovered and in the process not only deprived the defendant of

---

[5] Although the defendant makes the additional claim that there was a material discrepancy with respect to where the hair was found, this discrepancy is not sufficient to justify the exclusion of the evidence. It is undisputed that a key ring containing a set of keys was seized from the defendant, that these items were wrapped in a plain piece of paper and placed in a sealed package, that the sealed package was delivered to Agent Spalding by Trooper White, that Spalding turned the sealed package over to Agent Malone who opened the package, removed the various items and made his observations. While it is true that both Troopers Terry and Raposa testified that they had observed a hair embedded in encrusted blood on a key instead of on the key ring, the discrepancy is one of observation, memory, or description. Since it is clear that the hair was found embedded in dry blood on one of the items seized from the defendant, the precise location of the hair goes to the weight of the evidence rather than to its admissibility.

the opportunity of presenting evidence[6] on his own behalf but by introducing the results of the tests denied him a fair trial.

A fair trial is implicit in the term "due process of law." "The requirements of due process are met in the trial of a person accused of crime if he has been given the benefit of a fair and impartial trial in accordance with the settled course of judicial proceedings in this state." *Wojculewicz* v. *Cummings,* 145 Conn. 11, 19, 138 A.2d 512, cert. denied, 356 U.S. 969, 78 S. Ct. 1010, 2 L. Ed. 2d 1075 (1958). Whether the defendant, under the facts of the present case, has been deprived of his right depends upon the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence. *State* v. *Hamele,* 188 Conn. 372, 381, 449 A.2d 1020 (1982); *State* v. *Harden,* 175 Conn. 315, 327, 398 A.2d 1169 (1978).

"The state is under an affirmative duty to disclose to a defendant any evidence that is favorable to him and material to his guilt or innocence. [*Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)]. The duty to disclose includes a duty to preserve evidence prior to trial. . . . In order to show a violation of the constitutional right set forth in *Brady,* a defendant must demonstrate, to the extent possible under the circumstances, that the evidence is both favorable and material to an element of his defense . . . . The scope of the required showing of favorableness is gauged against what it would be possible to show under the circumstances. . . .

---

[6] In a pretrial motion for discovery the defendant requested production of tangible objects including key rings, hair samples and blood samples in order to have reasonable tests made.

"Thus, where evidence sought to be disclosed has been functionally destroyed, but was subjected to scientific testing by the state prior to its destruction, a defendant must show that a retest would have been possible and must challenge the state's test results, either by attacking the manner in which the test was conducted or by other evidence. . . . On the other hand, if the state has not tested an item of evidence before its loss or destruction, and no other facts indicate that test results might have proved unfavorable to the defendant, little more is required than a showing that the test could have been performed and results obtained which, in the context of the defendant's version of the facts, would prove exculpatory. . . . If a due process violation is established, the trial court must take whatever action is reasonably necessary to prevent prejudice to the defendant." (Citations omitted.) *State* v. *Kersting*, 50 Or. App. 461, 623 P.2d 1095, 1103–1104 (1981).[7]

That the blood samples tested by the state were material is beyond dispute. The fact that a fragment of the victim's hair was found embedded in human blood on the defendant's key ring was highly inculpatory. The defendant does not question the results of the state's test, namely, that the substance on the key ring was human blood and the substance on the hair was blood. Nor does he contend that the destruction was deliberate. *United States* v. *Beltempo*, 675 F.2d 472, 479 (2d Cir.), cert. denied, 457 U.S. 1135, 102 S. Ct. 2963, 73 L. Ed. 2d 1353 (1982). His chief complaint is that if he had had an opportunity to test the samples he might have been able to establish that the blood on the key

---

[7] We agree with *Kersting* that in cases where destruction of evidence is likely during the testing, questions concerning the deprivation of due process rights would be substantially obviated if the state adopted a procedure to notify the defendant that tests are about to be conducted thereby giving the defendant an opportunity to arrange for his expert to be in attendance. *State* v. *Kersting*, 50 Or. App. 461, 623 P.2d 1095, 1104 n.4 (1981).

ring and the hair was not the blood of the deceased and that such evidence would have defeated the inference that the hair was deposited at the time of the decedent's death. The rationale for this theory was that the defendant and the decedent were close friends who spent much time together and that both were medical students and as such were exposed to clinical blood. The difficulty with the defendant's claim is that it is unsupported. The defendant offered no evidence nor made any offer of proof that the amounts of blood on the key ring and the hair were sufficient, if properly tested, to establish blood type. In the absence of such evidence or offer the defendant's claim was speculative. Furthermore, the defendant does not challenge the state's assertion that the testing of the samples necessarily consumed each sample. In the circumstances we cannot conclude that the defendant has been denied a fair trial.

## IV

### EVIDENCE OF PRIOR UNRELATED OFFENSE

While the defendant was at the New Hartford town hall to give a statement to the troopers investigating the homicide, he was asked by Trooper Terry whether in the course of the previous evening he or the victim had consumed any alcohol or drug of any kind. Over the objection of the defendant, Terry testified that the defendant had responded by saying that he and the victim "had smoked some marijuana on the way down from New York." Thereafter, at the defendant's request, the court gave an instruction to the jury cautioning them that, if they believed this testimony they were not to consider it as bearing adversely on the defendant's character and should not be prejudiced against the defendant by reason of it; rather, it could be considered by them only to the extent they believed it to be relevant to the issues in the case. The defendant took no exception to the cautionary instruction.

The defendant told part of his story to a number of people. The first person the defendant saw when he came down from the mountain on the morning of July 30, 1978, the day after the murder, was Frank Jones. Jones, on noting the defendant's apparently drugged or intoxicated state asked the defendant whether he had been on drugs or drinking to which the defendant responded that he thought they (he and the victim) had "had a few beers." Later that morning the defendant told Trooper Terry that, on the trip from New York to New Hartford the night before, he and the deceased had smoked marijuana but "no hard stuff."

Although these two accounts were not necessarily contradictory in that the response to Jones referred to what the defendant and the victim were doing on Jones' Mountain whereas the statement to Trooper Terry referred to what had transpired during the trip to New Hartford, their significance is more readily apparent when viewed in context. The what, the when, the where and the how of a sequence leading up to an event may sometimes reveal the who and the why.

A spectacular incident such as a murder is not merely a snapshot of an event fixed in time. To be understood it must be viewed as part of a sequence both before and after its occurrence. The events leading up to the brutal assault on Jones' Mountain help to place the ultimate crime in its proper setting. Since the defendant was at the very least a supporting actor in these events his description of what occurred assists the trier in defining his role. Since, by his own account, the defendant was the last known person to have seen the victim alive and since he and the deceased had been together for a considerable period of time before the murder, the defendant's story takes on added significance. Upon careful analysis the account may assist in determining whether the defendant was a feature actor in the murder drama or merely a bit player.

The murder was brutal. The victim had been subjected to numerous stab wounds and had been bitten on his shoulder blade. The murder appeared to have been perpetrated by someone who was mentally or emotionally agitated probably while under the influence of mind altering drugs. Jones noted that the defendant appeared to be under the influence of drugs or alcohol. Trooper Bieluch, who observed the defendant a few hours later, noticed that he appeared to be under an altered state of consciousness, apparently drug related. In context the defendant's statement to Jones can be regarded as a cover-up. His later admission to Trooper Terry that he had smoked marijuana but no hard stuff on the trip from New York might also suggest that he was attempting to cover up the fact that he may have ingested more than a few beers on the mountain.

Evidence of other misconduct, although ordinarily not admissible to prove the bad character of the accused may be allowed for the purpose of proving, inter alia, such things as intent, motive, identity, malice or a system of criminal activity. *State* v. *Williams*, 190 Conn. 104, 107–108, 459 A.2d 510 (1983). That such evidence tends to prove the commission of other crimes by the accused does not render it inadmissible if it is otherwise relevant and material. *State* v. *Ibraimov*, 187 Conn. 348, 352, 446 A.2d 382 (1982). "Where such evidence is offered in proof of an issue in the case, and not merely to show an evil disposition on the part of the accused, the trial court must still consider whether its prejudicial tendency outweighs its probative value before ruling upon its admissibility." Id. Since the admission of such evidence involves judicial discretion our review is limited to whether this ruling exceeded the latitude accorded to the exercise of such discretion. Id. The bounds of discretion were not exceeded in this respect.

## V

### EXTREME EMOTIONAL DISTURBANCE

At the request of the state and over the objections of the defendant the trial court charged the jury on the lesser included offense of manslaughter in the first degree predicated on the defendant's having committed the homicide under circumstances showing extreme emotional disturbance. General Statutes § 53a-55 (a) (2).[8] The grounds of the defendant's objection are that there was an insufficient evidential basis for the submission of this crime to the jury and that the illustration given to the jury for their consideration of this case was legally inappropriate.

At the outset the state suggests that we need not review this assignment because the jury returned a general verdict. The state argues that the trial court submitted the manslaughter issue to the jury not only under the extreme emotional disturbance subsection but also under subsection (a) (1) which covers situations in which an accused "[w]ith intent to cause serious physical injury to another person . . . causes the death of such person," that there was sufficient evidence to convict under this subsection, that the defendant could have requested the court to inquire of the jury under which subsection they were basing their verdict; *State v. Carter,* 189 Conn. 611, 629, 458 A.2d 369 (1983); and that by failing to do so the defendant has failed to pre-

---

[8] "[General Statutes] Sec. 53a-55. MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when: . . . (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as provided in subsection (a) of section 53a-54a, except that the fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subsection . . . ."

sent this court with an adequate record to review his claim; see *Kaplan* v. *Kaplan,* 186 Conn. 387, 388 n.1, 441 A.2d 629 (1982); and therefore we should not speculate on which subsection the jury relied.

In *State* v. *Marino,* 190 Conn. 639, 650–51, 462 A.2d 1021 (1983) we stated, "[w]here a person may have been convicted under more than one statutory alternative, the judgment cannot be supported unless the evidence was sufficient to establish guilt under each statutory provision which the trier may have relied upon." Since *Marino* involved an indictment for murder under which a three judge panel convicted the defendant of manslaughter in the first degree with a firearm, General Statutes § 53a-55a,[9] without specifying under which subsection of General Statutes § 53a-55 (the statute involved in this case) the defendant was found to have committed the manslaughter, the ruling in *Marino* is applicable here. See *State* v. *Reid,* 193 Conn. 646, 480 A.2d 463 (1984). We must therefore review the defendant's claim about the sufficiency of the evidence with regard to extreme emotional disturbance.

Extreme emotional disturbance is not an element of the crime of murder. *State* v. *Elliott,* 177 Conn. 1, 5, 411 A.2d 3 (1979); *People* v. *Patterson,* 39 N.Y.2d 288, 383 N.Y.S.2d 573, 347 N.E.2d 898 (1976). It is, how-

---

[9] "[General Statutes] Sec. 53a-55a. MANSLAUGHTER IN THE FIRST DEGREE WITH A FIREARM: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. No person shall be found guilty of manslaughter in the first degree and manslaughter in the first degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information.

"(b) Manslaughter in the first degree with a firearm is a class B felony for which one year of the sentence imposed may not be suspended or reduced by the court."

ever, a mitigating circumstance which will reduce the crime of murder to manslaughter. *State* v. *Elliott,* supra, 9. In an indictment for murder, under General Statutes § 53a-54a, the defendant may raise extreme emotional disturbance as an affirmative defense,[10] in which case the burden is on the defendant to establish this defense by a preponderance of the evidence. General Statutes § 53a-12 (b); *State* v. *Zdanis,* 182 Conn. 388, 390, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981); *State* v. *Elliott,* supra, 6.

Under General Statutes § 53a-55 (a) (2)[11] manslaughter predicated on the mitigating circumstance of extreme emotional disturbance is a lesser included offense of murder. See *State* v. *Rodriguez,* 180 Conn. 382, 404, 429 A.2d 919 (1980). Under § 53a-45 (c) the "jury before which any person indicted for murder is tried may find him guilty of homicide in a lesser degree than that charged." It follows that in any murder prosecution the issue of the lesser included offense of manslaughter under § 53a-55 (a) (2) may be raised either by the defendant by way of an affirmative defense or by the state where it is warranted by the evidence. Thus although in a given homicide the state may, in good faith and where circumstances reasonably warrant, assume that an accused acted with the most culpable state of mind, where the evidence is reasonably susceptible of another conclusion the jury should not be bound by that assumption and forced by its verdict to choose only between the offense with the most culp-

---

[10] To raise this defense requires no special plea, notice or other formal assertion by the defendant. *State* v. *Marino,* 190 Conn. 639, 651 n.11, 462 A.2d 1021 (1983).

[11] The situation which we discuss above is to be differentiated from the case of a prosecution initiated by the state under the same subsection. In the latter case the state need only prove the elements of murder because the statute specifically provides that extreme emotional disturbance need not be proved.

able state of mind and acquittal. Id. Given the existence of the requisite mitigating circumstance and compliance with the lesser included offense conditions set out in *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980), failure to give a requested instruction on the lesser included manslaughter offense would limit the jury's function of determining the degree of homicide contrary to § 53a-45 (c). In enacting this manslaughter statute the legislature intended to allow the finder of fact the discretionary power to mitigate the penalty of murder when presented with a situation which, under the circumstances, appears to them to have caused an understandable weakness in one of their fellows. *People* v. *Casassa,* 49 N.Y.2d 668, 680, 427 N.Y.S.2d 769, 404 N.E.2d 1310, cert. denied, 449 U.S. 842, 101 S. Ct. 122, 66 L. Ed. 2d 50 (1980).[12] The fact that the defendant may rely on the mitigating circumstance as an affirmative defense to murder does not mean that by his contrary election he may also circumscribe the homicide offenses which the jury may consider.

The evidence, necessarily circumstantial; *State* v. *Rodriguez,* supra; is sufficient to support a conviction of manslaughter in the first degree under circumstances of extreme emotional disturbance. The facts that the victim's body contained more than 100 stab wounds and a bite mark made by the defendant, that the defendant had not had much sleep during the time preceding the killing, that on the morning of the killing he was so clearly under the influence of some drug or alcohol, that persons who had never seen him before came to that conclusion, and that he appeared to be in a tense and agitated state would tend to show that

[12] Because the Connecticut penal code has been modeled after its New York counterpart we have derived sustenance from the New York decisions interpreting its code. *State* v. *Elliott,* 177 Conn. 1, 4-5, 411 A.2d 3 (1979).

the defendant was motivated by more than just a desire to take life. Taking all of these facts into account the jury would have been justified in concluding that the defendant committed the homicide at a time when he was extremely emotionally disturbed.

## A

### PUTATIVE "HEAT OF PASSION" ILLUSTRATION

In discussing extreme emotional disturbance the trial court commented: "The classic example of such cases are [sic] when the husband returns home to find his wife making love to a stranger and then kills one or both of them. I recall nothing in the events of this nature but remember, it is your recollection that counts, not mine." The defendant argues that the example of a "hot-blood" killing is not an appropriate example of an extreme emotional disturbance as defined by Connecticut law. We do not completely agree.

To find that a homicide has been committed under circumstances of extreme emotional disturbance the trier of fact must find that: (a) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; (b) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (c) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feeling, such as passion, anger, distress, grief, excessive agitation or other similar emotions. *State* v. *Zdanis,* 182 Conn. 388, 390–91, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981). Although a homicide influenced by an extreme emotional disturbance is not one which is necessarily committed in the "hot blood" state but rather can be one brought about by a significant mental trauma that caused the defendant to brood for a

long period of time and then react violently, seemingly without provocation; *State* v. *Elliott,* 177 Conn. 1, 7-8, 411 A.2d 3 (1979); nothing that we said in *Elliott* would preclude a trier from finding a hot blood homicide to have occurred under extreme emotional disturbance. As we pointed out in *Elliott,* supra, 10, a charge that limits extreme emotional disturbance to the "hot blood" stage is erroneous because it is too narrow. It thus precludes a trier from convicting a defendant of the lesser degree of homicide. If despite or because of the "hot blood" charge a defendant is convicted of manslaughter instead of murder he cannot be heard to complain.

## B

### PRESUMED INTENT

The defendant claims that the effect of the trial court's instruction that "[e]very person is presumed to intend the natural and necessary consequences of his or her acts" was either to create a conclusive presumption of intent under certain circumstances or to shift to the defendant the burden of persuasion and that in either event this instruction denied to the defendant a fair trial. *Sandstrom* v. *Montana,* 442 U.S. 510, 524, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). The charge[13] in this case, when examined in context, is no different from similar charges which we have examined in the

---

[13] "Now, intent is a mental process. The person's intention may be inferred from his conduct. Every person is presumed to intend the natural and necessary consequences of his or her acts. It is often impossible and never necessary to prove criminal intent by direct evidence. Ordinarily, intent can be proved only by circumstantial evidence, as I have explained that term to you. What a person's purpose or intention has been is necessarily very largely a matter of inference. A person may take the stand and testify directly as to what his or her purpose or intention was, and that testimony you can believe or not according to whether or not it warrants belief, but no witness can be expected to come here and testify that he looked into another person's mind and saw therein a certain purpose or intention. The only way in which a Jury can determine what a person's purpose or inten-

past. In those cases we have found no basis for reversible error when the trial court defined the presumption in permissive terms and left it to the jury to decide whether the state had proven intent beyond a reasonable doubt. *State* v. *Miller,* 186 Conn. 654, 668, 443 A.2d 906 (1982) (and cases cited therein). Upon examination of the challenged instruction we find no basis for reaching a different result in the present case.

## VI

### JUROR MISCONDUCT

The defendant moved for a new trial on a number of grounds, two of which he has pressed on appeal. These are two instances of juror misconduct, one involving the use of a dictionary definition of "inference," the other concerning the use of nonevidential material in conducting an experiment during deliberations. After a hearing the trial court denied the motion on both grounds. We find no error.

A motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. *Bernier* v. *National Fence Co.,* 176 Conn. 622, 628, 410 A.2d 1007 (1979). If the motion is based on juror misconduct "[t]he rule extracted from the cases seems to be, that however improper such conduct may have been, yet if it does

---

tion was at a given time, aside from that person's own testimony, is by determining what that person's conduct was and what the circumstances were surrounding his conduct, and from those infer what his or her purpose or intention was. To draw such an inference is not only a privilege, but it is also the duty of the Jury provided, of course, the inference drawn is a reasonable one. In this case, therefore, it will be part of your duty to draw all reasonable inferences from the conduct of the accused in the light of the surrounding circumstances as to what purpose or intention was in his mind at various times.

"In order for the accused to be found guilty of the charge of murder, you must find beyond a reasonable doubt that he had an intent to cause the death of Michael Aranow. If you do not find proven beyond a reasonable doubt that the accused had that intent, then he is not guilty of murder."

not appear that it was occasioned by the prevailing party, or anyone in his behalf; if it [does] not indicate any improper bias upon the juror's mind, and the court cannot see, that it either had, or might have had, an effect unfavorable to the party moving for a new trial; the verdict ought not to be set aside." *Pettibone* v. *Phelps,* 13 Conn. 445, 450 (1840); *State* v. *Watkins,* 9 Conn. 46, 51 (1831).

Juror misconduct which results in substantial prejudice to the defendant is not to be tolerated. But not every irregularity in a juror's conduct compels reversal. "The dereliction must be such as to deprive the defendant of the continued, objective and disinterested judgment of the juror, thereby foreclosing the accused's right to a fair trial." *Nelson* v. *United States,* 378 A.2d 657, 660 (D.C. 1977); *United States* v. *Fay,* 238 F. Sup. 1005, 1007 (S.D.N.Y. 1965). Consideration of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury. *State* v. *McCall,* 187 Conn. 73, 80, 444 A.2d 896 (1982). A presumption of prejudice may also arise in cases involving communications between a juror and third persons. *Remmer* v. *United States,* 347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954) (attempted jury tampering); *Aillon* v. *State,* 168 Conn. 541, 547–48, 363 A.2d 49 (1975) (ex parte communication between judge and juror). But unless the nature of the misconduct on its face implicates his constitutional rights the burden is on the appellant to show that the error of the trial court is harmful. *Aillon* v. *State,* supra, 547; *State* v. *L'Heureux,* 166 Conn. 312, 323, 348 A.2d 578 (1974).

### A

USE OF DICTIONARY DEFINITION OF "INFERENCE"

The trial court found that during the deliberations Juror Streib read a definition of the word "inference"

which he had copied from a Funk & Wagnall dictionary. The definition as read to the jury is as follows: "Item 1, that which is inferred; a deduction or conclusion; Two, the act or process of inferring; Three, loosely a conjecture . . . ; Four, is the comprehensive term for the formal drawing of conclusions; it includes both induction and deduction. Deduction is the inferring of a universal or general rule from instances. Deduction is the reverse process of drawing a conclusion as to a particular instance from general premises." The definition particularly objected to is "loosely, a conjecture."

To begin with, the definition of words in our standard dictionaries is taken as a matter of common knowledge which the jury is supposed to possess. *Dulaney* v. *Burns*, 218 Ala. 493, 119 So. 21 (1928). Therefore, the fact that one juror tells another juror what the other juror is supposed to know does not qualify to raise a presumption of prejudice. Prejudice must be demonstrated. *Shultz* v. *State*, 417 N.E.2d 1127 (Ind. App. 1981). In this case the claim of prejudice is that the jury might have believed that in drawing inferences they were entitled to rely on guess, surmise or conjecture. The trial court, pointing out that its charge to the jury was lengthy and complete on the word "inference" and that the jury asked that the part of the charge involving circumstantial evidence and inference be repeated, could find no such prejudice and neither can we. Not only did the court give the jury the customary instruction that they must accept the law from the court but during the discussion of inferences cautioned that "[t]he inference you draw, however, must not be a guess or surmise upon the evidence but must be from a fact which the evidence has established. Inferences that you may draw from these established facts must be logical and reasonable and well-founded upon the facts which have [been] proven in the trial of the case." In the absence of a clear indication to the contrary, we must

presume that the jury followed this instruction. *State* v. *Griffin,* 175 Conn. 155, 160, 397 A.2d 89 (1978).

We hasten to add that the fact that we have found no error in this case does not mean that a trial judge is authorized to furnish a dictionary to a jury upon their request. There may be situations where furnishing a dictionary to a jury may create a presumption of prejudice arising out of injecting unauthorized informational and definitional material into the jury instructions; *State* v. *Holmes,* 17 Ore. App. 464, 522 P.2d 900 (1974); but that is not this case.

## B

### EXPERIMENT BY JURORS IN DELIBERATION ROOM

The defendant claims that it was prejudicial for Juror Turner surreptitiously to bring into the jury room a belt and shirt, not introduced into evidence as exhibits, and to utilize these articles in an experiment in which one juror tried to lift another juror lying prone on the floor and carry him five or six feet. The defendant maintains that the introduction of articles not admitted into evidence and their use in conducting an experiment denied the defendant his right to test the evidence or to question the premises, the methods or the results of the experiment and that such actions of the jury constitute a denial of the defendant's rights of confrontation, of counsel and of cross-examination and also denied him a fair trial.

After hearing the evidence on the defendant's motion, the trial court found that the jury conducted the experiment to test the state's claim that a single person such as the defendant could have lifted the victim and carried him several feet, and that the experiment was suggested by the activities of the defendant's counsel and his investigator in reenacting part of the same experiment in the courtroom before the jury. The

court further found that the items which were brought into the jury deliberating room, a shirt and a belt, were common everyday items which practically every male wears, and that the experiment was conducted in a manner that has reasonably been consistent with the testimony presented to the jury and merely tested the credibility of that testimony. The trial court concluded that the state had proved beyond a reasonable doubt that any misconduct of the jury in this regard was harmless and without prejudice to the defendant. We agree.

"In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner* v. *Louisiana,* 379 U.S. 466, 472–73, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965). "The problems presented by an experiment conducted by jurors on their own defy precise, systematic analysis. A juror is expected to draw upon his general knowledge and experience in deciding the case, and he is encouraged to participate in full and robust debate and deliberations with his fellows in reaching a verdict. However, he should not consider facts relating to the case unless introduced at trial under constitutional and legal safeguards . . . . Accordingly, when a juror passes beyond the record evidence in reaching a decision, whether a new trial will be granted depends upon the magnitude of the juror's deviation from his proper role, the degree to which the accused was deprived of the benefits of the constitutional and statutory safeguards, and the likelihood that the impropriety influenced the jury's verdict. All of these elements must be weighed in determining whether there is a reasonable possibility that the

defendant's right to a fair trial has been prejudiced."
*State* v. *Graham,* 422 So. 2d 123, 132 (La. 1982).

That it was inappropriate for Juror Turner to bring the shirt and belt into the deliberating room for experimental purposes is beyond dispute. But in themselves neither item proved anything. Moreover, the experiment was not designed to test whether the victim's body had in fact been moved. It was apparent from an examination of the area that there was a primary and secondary crime scene at the lookout and that the body had been lifted five and one-half to six feet from the primary to the secondary scene. Thus the question posed to the jury by the defendant's challenge to the state's theory about how the crime had been committed was whether it was likely that the defendant could have carried the victim from one place to the other because the victim outweighed him by some fifteen pounds. In the experiment the juror who played the role of the victim outweighed the lifting juror by some nineteen pounds. Thus the situations were comparable. Indeed, the defendant does not challenge the reliability of the experiment for the limited purpose for which it was used. Although the victim was not wearing a belt, the reason a belt was used by the jury can be explained by the fact that when the defendant's attorney had his investigator play the role of the victim in a partial demonstration before the jury, the investigator was wearing a belt. Since the jury were well aware not only of the limited purpose of the experiment but also of the fact that the belt was being used to avoid the possibility of ripping the pants of the victim-juror the possibility that the jury could have been influenced by the use of a belt in the experiment is remote. Nor does the defendant contend otherwise. In the circumstances, the trial court's finding that the jury experiment was not

prejudicial to the defendant not being clearly erroneous, its denial of the defendant's motion for a new trial on the ground stated cannot be disturbed.

The cases cited by the defendant are distinguishable. With one possible exception which we discuss infra they all have one thing in common, namely, the unauthorized introduction into the deliberating process of a new evidential fact. *Bulger* v. *McClay,* 575 F.2d 407 (2d Cir. 1978) (unauthorized discovery of defendant's address which was located at some distance from the crime scene and therefore tended to discredit his excuse for being at a particular bus stop near the scene of the crime); *Durr* v. *Cook,* 442 F. Sup. 487 (W.D. La. 1977) (jury foreman reenacted the homicide outside of the jury room and reported the results to his fellow jurors); *People* v. *Holmes,* 69 Ill. 2d 507, 372 N.E.2d 656 (1978) (several members of jury made independent investigation of a type of shoe claimed to be worn by the assailant); *People* v. *Brown,* 48 N.Y.2d 388, 423 N.Y.S. 2d 461, 399 N.E.2d 51 (1979) (juror conducted independent test of visibility, using motor vehicle different from that described in the evidence and reported results to the jury); *People* v. *Crimmins,* 26 N.Y.2d 319, 310 N.Y.S. 2d 300, 258 N.E.2d 708 (1970) (jury made unauthorized visit to the neighborhood of the crime scene).

In *United States* v. *Beach,* 296 F.2d 153 (4th Cir. 1961), a perjury case, the defendant had testified before the grand jury that he did not know that certain men were using a certain room in a certain home, that he had not seen one of the men in the home and that he had not heard certain machinery in the home. The men were evidently connected with a numbers operation and had put in their rented room certain adding machines at which they worked for several hours daily. After the jury retired to consider their verdict, they sent back a message requesting the court to send them an elec-

tric drop cord. The defense attorney was then absent from the courtroom. The court had an electric drop cord delivered to the jury and so advised the defense counsel on his return to the courtroom. The defense counsel objected on the ground that the jury obviously wanted the cord in order to test the amount of noise made by the running of the adding machines. The machines had been introduced in evidence and sent to the jury in the jury room. However, when being operated as part of the numbers operation each machine sat on a foam rubber pad two inches thick. The padding had been removed from the machines when the machines were introduced into evidence and was separately introduced. Because of the possibility that the jury might conduct the experiment without the padding and, therefore, under conditions dissimilar to the circumstances which existed where the numbers operation was being carried on, the fourth circuit reversed. Although there are some similarities between *Beach* and the present case, the significance of the experiment in *Beach* to the issues in the case and the greater risk of prejudice involved in that case also distinguishes it from the case at bar.

Even were we to conclude that there was a reasonable possibility of prejudice from the use of the belt in the experiment, the other circumstantial evidence so overwhelmingly points to the defendant's guilt of manslaughter in the first degree that the trial court was correct in concluding that any error created by juror misconduct was harmless beyond a reasonable doubt.

There is no error.

In this opinion the other judges concurred.