JOSEPH GRIGERIK *v.* GARY SHARPE
(AC 15099)

Landau, Heiman and Shea, Js.

Argued January 21—officially released July 22, 1997

*Elizabeth Fairbanks Flynn*, with whom was *Lorinda S. Coon* for the appellants (defendants).

*Michael C. Stumo*, with whom, on the brief, was *Timothy Brignole*, for the appellee (plaintiff).

### Opinion

SHEA, J. The defendants, Gary Sharpe and Angus McDonald-Gary Sharpe and Associates, Inc., have appealed from a judgment rendered on a jury verdict awarding the plaintiff, Joseph Grigerik, damages for breach of a contract to perform soil and percolation tests and to design a site plan and septic system for unimproved land of the plaintiff and also for the defendants' negligence in performing the contract. As grounds for reversing the judgment, the defendants claim that (1) the plaintiff, who is not a party to the contract, fails to qualify for the status of a third party beneficiary

entitled to enforce the contract, (2) the negligence count[1] of the complaint is barred by the applicable statute of limitations, and (3) the trial court abused its discretion in allowing amendments to the complaint adding new allegations of misconduct by the defendants and in ruling that the opinions of two expert witnesses for the plaintiff were admissible. We reverse the judgment on the contract count of the complaint because of an improper charge and order a new trial on that count. We agree with the defendants that the judgment on the negligence count must be reversed because of the statute of limitations and order that judgment for the defendants be rendered on that count. That disposition of the negligence count makes it unnecessary to consider the propriety of allowing the amendments to that count. With respect to the challenged rulings on evidence, we find no abuse of discretion.

There is no significant dispute about the facts that the jury might reasonably have found from the evidence in support of their verdict. In 1983, Edward Lang purchased a tract of undeveloped land on Reservoir Road in the town of Killingworth. The property contained a hill, a marshy area, trees and many vines and bushes. Lang removed some of the trees and bushes and also obtained the release of a power line easement that the utility company no longer needed. Because the land was adjacent to a reservoir, it was within a designated watershed area.

In 1985, Lang negotiated with the plaintiff for the sale of the land. The plaintiff offered $9000 for the property

---

[1] The amended complaint contains four counts. Separate counts alleging breach of contract are directed against the individual and the corporate defendant and the two negligence counts are similarly pleaded. Before the case was submitted to the jury, however, the first two counts against the individual defendant were withdrawn. The jury verdict was rendered against both defendants on the third count for breach of contract and on the fourth count for negligence. The opinion refers to these counts respectively as the breach of contract count and the negligence count.

"as is." He told Lang, however, that he would pay $16,000 if Lang would do the work necessary to obtain the town's approval of the land as a building lot. Lang agreed to do so. Both of them accompanied the sanitarian for Killingworth when he examined the property. He told them that, because the land was within a watershed district, they needed an engineer to prepare a site plan for drainage.

Lang hired the defendant Gary Sharpe, a professional engineer, and the corporate defendant to prepare a site plan, to design a subsurface sanitary sewage disposal system and to perform the necessary soil testing. Lang told Sharpe that he needed the site plan in order to obtain approval of the land as a building lot and that he had a buyer for the land if the town granted approval.[2] Sharpe did some of the work necessary for the application and various employees of his firm performed the remainder. They completed their work on the site plan on October 16, 1985. After receiving the site plan from Sharpe, Lang presented it to the Killingworth inland wetlands commission, which granted its approval. On November 19, 1985, Lang sold the property to the plaintiff for $16,000, as they had agreed.

In the spring of 1986, the plaintiff cleared the land and applied to the town sanitarian for the permits necessary to begin construction of a house in August. The new town sanitarian for Killingworth denied the plaintiff's application for a building permit even though his predecessor had told the plaintiff that the septic system would be approved. The new sanitarian said he was concerned about the suitability of the soil conditions and whether the percolation tests had been performed in the presence of the previous sanitarian. He told the plaintiff that additional percolation tests would have to be per-

---

[2] The defendant Gary Sharpe testified at trial that Lang had not informed him of his intention to sell the property.

formed by an engineer in the presence of a representative of the state department of health (department) during the following spring when the soil would be saturated.

When the percolation tests were performed on March 5, 1987, it was concluded that a curtain drain would have to be installed on the land in order to control the seasonally high groundwater. After the plaintiff had constructed the curtain drain, more percolation tests were completed and submitted to the department. On May 20, 1987, that department informed the plaintiff that the tests indicated that the land was unsuitable for a septic sewage disposal system. Additional percolation testing was done in the spring of 1989 in the presence of a department representative, who determined that the tests indicated that minimum public health standards for a septic system could not be met and that the building permits could not be issued.

The plaintiff commenced this action by service on Sharpe on September 20, 1989, and, pursuant to a motion to cite in an additional defendant, his corporation was served on June 5, 1991. After a trial, the jury found the issues for the plaintiff and rendered a verdict for damages of $44,024, including interest, on both the negligence and breach of contract counts of the complaint.

I

THIRD PARTY BENEFICIARY

Because the plaintiff was not a party to the oral contract between Lang and Sharpe, he cannot prevail in this suit on that contract unless he was a third party beneficiary thereof. On this issue the trial court charged the jury that, "[i]f it was intended that [the plaintiff] was an intended, contemplated or foreseeable beneficiary to the contract, then you must find that [the plaintiff] was a third party beneficiary to the contract." The court

submitted three interrogatories to the jurors inquiring whether they found the plaintiff to be an "intended third party beneficiary," "a contemplated third party beneficiary," or "a foreseeable third party beneficiary." The jurors responded no to the first and second inquiries and yes to the third. The defendants claim that the charge was erroneous because the test to be applied is "whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party . . . ." (Internal quotation marks omitted.) *Knapp* v. *New Haven Road Construction Co.*, 150 Conn. 321, 325, 189 A.2d 386 (1963). The defendants also claim that the negative responses to the first and second interrogatories indicate that the jury found that the parties to the contract never intended to create such a direct obligation to the plaintiff.

The first Restatement of Contracts recognized the right of a nonparty to enforce a contract made by others if he was either a donee or creditor beneficiary thereof. 1 Restatement (First), Contracts § 133 (1) (a) and (b) (1932). Any other persons who might benefit from performance of the contract were termed "incidental beneficiaries" and would have no legal rights under the contract. Id., §§ 133 (1) (c) and 147. In this case, the plaintiff was not a donee beneficiary because there is no evidence that the promisee, Lang, intended to make a gift to him. Id., § 133 (1) (a). Their relationship was contractual, involving the sale of land. The plaintiff qualifies as a creditor beneficiary of Sharpe's agreement with Lang, however, if "performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary . . . ." Id., § 133 (1) (b). Lang agreed to obtain the necessary permits from the town for construction of a house on the land he sold to the plaintiff as a condition of their agreement. In order to fulfill his obligation to the plaintiff, Lang employed the defendants to design a septic system and

to perform the percolation tests required. He informed Sharpe of his intention to sell the land upon obtaining such approval rather than use the lot himself.[3] Lang's purpose in contracting with the defendants was to fulfill his obligation to the plaintiff to convey an approved building lot to him. The evident purpose of the transaction with the defendants was to enable Lang to sell his land to the plaintiff at the enhanced price agreed on for the lot. Thus, "performance of the promise [would] satisfy an actual duty of the promisee to the [plaintiff]" and the plaintiff would qualify as a creditor beneficiary of that contract according to § 133 (1) (b) of the Restatement (First) of Contracts.

The Restatement (Second) of Contracts classifies third party beneficiaries into two categories, "intended beneficiaries," who have a right to enforce a contract made by others, and "incidental beneficiaries," who have no such right. 2 Restatement (Second), Contracts § 302 (1981). "Unless otherwise agreed . . . a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." Id. The apparent reason for abandonment of the "donee" and "creditor" beneficiary classifications was to inaugurate a fresh start in this area of the law by adopting the view of Professor Corbin that nonparties eligible to qualify as third party beneficiaries ought not to be restricted to the donee and creditor categories that Professor Williston had coined.[4] See 2

---

[3] See footnote 2.

[4] "Since the terms 'donee' beneficiary and 'creditor' beneficiary carry overtones of obsolete doctrinal difficulties, they are avoided in the statement of rules in this Chapter." 2 Restatement (Second), supra, c. 14, Introductory Note. "The stated reason for the change was the 'creditor' and 'donee'

Restatement (Second), supra, c. 14, Reporter's Note. There is no indication that the authors of § 302 intended to allow only those creditors to become third party beneficiaries whom a promisor has agreed to pay in satisfaction of a monetary debt of the promisee, as provided explicitly in § 302 (a). Section 302 (b) is sufficiently broad to encompass both donee and creditor beneficiaries. Accordingly, as a creditor beneficiary under the first Restatement, the plaintiff would be an intended beneficiary under § 302 (b) of the Restatement (Second).

In *Baurer* v. *Devenis*, 99 Conn. 203, 121 A.2d 566 (1923), our Supreme Court reexamined its earlier decisions involving third party beneficiary contracts, which had been generally regarded as denying to a nonparty the right to maintain an action at law on a contract for his benefit. The court noted that, in each of the cases in which a remedy at law had been denied, "the court has been careful to point out the equitable remedy . . . open to such person." Id., 208. Ultimately, in view of the union of law and equity achieved by our Practice Act (General Statutes § 52-91 [formerly § 607]), the court concluded that "[u]nless there be numerous parties or conflicting interests, we can see no sound reason why a third person to a contract made for, and intended by the parties for, his benefit, should not maintain his action, whether the relief demanded is legal or equitable." Id., 216.

In *Byram Lumber & Supply Co.* v. *Page*, 109 Conn. 256, 259–60, 146 A.2d 293 (1929), the court declared

categories were applied differently in different states, some recognizing an enforceable right in only one category, some in the other. Furthermore, courts in numerous cases had allowed recovery by third parties who were neither creditors nor donees, often purporting to apply the Restatement categories, and in so doing they had distended those classifications to the point that the law required restating." A. Waters, "The Property in the Promise: A Study of the Third Party Beneficiary Rule," 98 Harv. L. Rev. 1111, 1171–72 (1985).

that "the intent which must exist on the part of the parties to the contract in order to permit the third party to sue was not a desire or purpose to confer a particular benefit upon him, but an intent that the promisor should assume a direct obligation to him." Despite the reference to the intent of the "parties," the court acknowledged the absurdity of inferring that a promisor, in the absence of an explicit provision to that effect, would actually have intended to create a direct obligation that would furnish the basis for a possible suit against him. Referring to its decision in *Levy* v. *Daniels' U-Drive Auto Renting Co.*, 108 Conn. 333, 339, 143 A.2d 163 (1928), the court observed that "surely it would be a far cry to attribute to the person leasing the motor vehicle a purpose or desire to confer a benefit upon one injured by its operation." *Byram Lumber & Supply Co.* v. *Page*, supra, 260. In that case the court had upheld the right of an injured person, as a third party beneficiary of the leasing contract, to sue the lessor of an automobile that injured him while being operated by the lessee pursuant to a statute creating such a liability.

Nevertheless, our courts have continued to refer to the intent of the *parties* "to create a direct obligation" between the promisor and the beneficiary as the test for determining whether a nonparty to the contract is a third party beneficiary thereof. The term "direct obligation," as used by the courts, implies a right of the beneficiary to enforce the contract. It does not require that the promisor's performance be rendered directly to the beneficiary. *Stowe* v. *Smith*, 184 Conn. 194, 197, 441 A.2d 81 (1981). In determining whether a person has a right of action as a third party beneficiary, "[t]he ultimate test to be applied . . . is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary] and . . . that intent is to be determined

from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties." (Internal quotation marks omitted.) *Knapp* v. *New Haven Road Construction Co.*, supra, 150 Conn. 325; see *Gateway* v. *DiNoia*, 232 Conn. 223, 231, 654 A.2d 342 (1995); *Colonial Discount Co.* v. *Avon Motors, Inc.*, 137 Conn. 196, 202, 75 A.2d 507 (1950).

The notion that the promisor and promisee must share the same intent is at variance with most authorities. "There is no requirement of a mutual intent, as to the right of enforcement, on the part of the contracting parties; instead, it is the intent or purpose of the promisee who pays for the promise that has generally been looked upon as governing." 2 S. Williston, Contracts (3d Ed. 1959) § 356A, p. 836. The Restatement (Second) adopts Williston's view that it is the intent of the promisee "to give the beneficiary the benefit of the promised performance" that controls.[5] 2 Restatement (Second), supra, § 302, comment (b). Professor Corbin agrees that the intent of the promisor with respect to creating a right of enforcement in the third party is not significant. "[W]e can disregard the purposes and motives of the promisor after we once determine that he has made a legally operative contract with his promisee." 4 A. Corbin, Contracts (1951) § 776, p. 16.

In *Stowe* v. *Smith*, supra, 184 Conn. 196, the court appears to have departed from the view of the earlier cases that a mutual intent of the parties to create a direct obligation of the promisor to the beneficiary is essential to create a right of enforcement on the part

---

[5] "Unless otherwise agreed . . . a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." 2 Restatement (Second), supra, § 302 (1) (b).

of the third party. The opinion acknowledges the numerous cases in which it has "stated that a third party seeking to enforce a contract must allege and prove that the contracting parties intended that the promisor should assume a direct obligation to the third party"; id., 196; as well as the criticism of that doctrine by Williston, Corbin and other commentators. Id., 196–97 n.1. The court upheld the right of a beneficiary of a will to bring a contract action against the attorney who had drafted the will for his failure to follow the instructions of the testatrix, to the detriment of the beneficiary. "A promise to prepare a will pursuant to the instructions of a testatrix states a direct obligation to render a performance beneficial to her, i.e., the creation of a document which would enable her upon her death to effect the transfer of her assets to the beneficiaries named in her instructions. . . . If the defendant thwarted the wishes of the testatrix, an intended beneficiary would also suffer an injury in that after the death of the testatrix the failure of her testamentary scheme would deprive the beneficiary of an intended bequest. It therefore follows that the benefit which the plaintiff would have received under a will prepared in accordance with the contract is so directly and closely connected with the benefit which the defendant promised to the testatrix that under the allegations of the complaint the plaintiff would be able to enforce the contract." (Citations omitted.) Id., 197–98.

We can see no reason for refusing to apply the doctrine of *Stowe* to the case before us. There is no indication in *Stowe* that the attorney who prepared the will consciously intended to assume a direct obligation to the beneficiary who brought the malpractice action. Probably neither he nor the testatrix thought about that subject. It was appropriate, nevertheless, to imply a right of enforcement on the part of the beneficiary in

order to effectuate the intentions of the testatrix, the promisee.

The benefit that the plaintiff in this case would have received pursuant to the contract between Lang and the defendant Sharpe is also "directly and closely connected with the benefit which the defendant promised to [Lang under] the contract." Id., 198. The performance promised to Lang, to design a septic system and to do the necessary soil testing, is identical to that on which the plaintiff bases his claim. The circumstance that the plaintiff is a creditor beneficiary while Stowe was a donee beneficiary provides no reasonable ground for distinguishing the two cases. Nor is it significant that the identity of Stowe as a beneficiary of the will was disclosed to her attorney by the testatrix. It is not required that the third party beneficiary be named or otherwise identified at the time of the contract. *Byram Lumber & Supply Co.* v. *Page*, supra, 109 Conn. 261; *Levy* v. *Daniels' U-Drive Auto Renting Co.*, supra, 108 Conn. 339. "It is not essential to the creation of a right in an intended beneficiary that he be identified when a contract containing the promise is made." 2 Restatement (Second), supra, § 308.

"[I]n third party beneficiary contracts, intent has become a somewhat confusing basis of decision." 2 S. Williston, supra, § 356A, p. 836. In contract law, intent does not necessarily refer to the conscious mental processes of the parties making a contract. When making an oral contract, parties seldom focus on such contingencies as who would be entitled to enforce it in the event of a breach. The intent of a contract must be determined, not by speculating as to the thoughts of the parties, but from their words and acts under the circumstances revealed by the evidence. "The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with

the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used." *Ives* v. *Willimantic*, 121 Conn. 408, 411, 185 A. 427 (1936).

We return to the claim of the defendants that the trial court should have set aside the verdict for error in the charge and that judgment should be rendered for the defendants because of the jury's negative responses to the interrogatories as to whether the plaintiff was an intended or contemplated beneficiary of the contract. The defendants requested a charge to the effect that, unless the jury found that both Lang and Sharpe intended by their contract to create a direct obligation of the defendants to the plaintiff, the verdict on the contract count of the complaint should be for the defendants. Such a charge might have been appropriate in this state prior to *Stowe* v. *Smith*, supra, 184 Conn. 194, but we have concluded that the implications of that decision have changed the law and that such a mutual intent of the promisor and promisee is no longer necessary for a beneficiary to have a right to enforce the contract.

We also reject the claim that the answers to the interrogatories, finding that the plaintiff was neither an intended nor contemplated beneficiary of the contract, entitle the defendants to judgment on the contract count of the complaint. First, we agree with the defendants that the instruction to the jury that the plaintiff was a third party beneficiary eligible to recover damages for breach of contract if the jury should find that he was "an intended, contemplated or foreseeable beneficiary [of] the contract" was incorrect.[6] The plaintiff cites no

---

[6] The trial court instructed the jury on the third party beneficiary doctrine as follows: "The next question is whether [the plaintiff] was a third party beneficiary to the contract between Mr. Lang and the defendants. Thus, you must determine whether [the plaintiff] was an intended or foreseeable

authority, and we are aware of none, that supports the proposition that, if it is foreseeable that "any buyer of the property would derive a benefit from the contract," as the court charged, he becomes a third party beneficiary thereof. Such a person would be classified as an "incidental beneficiary" under both the first and second Restatements and would have no legal rights under the contract. 1 Restatement (First), supra, §§ 133 (1) (c) and 147; 2 Restatement (Second), supra, § 302, comment (e). Foreseeability in the law of torts is a useful concept in defining the circumstances under which a duty may arise to protect others against a particular harm. W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 43, pp. 297–300. It is not, however, a sufficient basis for establishing a contractual relationship. Id., § 92, pp. 655–56.

The instruction that, if he was a foreseeable beneficiary of the contract between Lang and the defendants, the plaintiff would be eligible to recover damages against the defendants for breach of contract, while harmful to the defendants, may also have misled the jurors with respect to their responses to the interrogatories concerning whether he was an "intended" or "contemplated" beneficiary. Although the charge linked those terms with "foreseeable" both disjunctively (thrice) and conjunctively (once), the jurors may well

---

beneficiary of the contracts. . . . In light of all the evidence, you must determine whether [the plaintiff] was an intended, contemplated or foreseeable third party which was to derive a benefit from the contract for professional services entered into between the defendants and Mr. Lang. You must determine that it was intended, contemplated and foreseeable that any buyer of the property would derive a benefit from the contract or you may determine that it was intended, contemplated or foreseeable that [the plaintiff] specifically would derive a benefit from the contract. If you find that it was intended that [the plaintiff] was an intended, contemplated or foreseeable beneficiary to the contract, then you must find that [the plaintiff] was a third party beneficiary to the contract. In summary, if you determine that [the plaintiff] was a third party beneficiary to the contract and that the defendants breached the contract, then [the plaintiff] is entitled to the damages caused him as a result of the breach."

have been under the impression that the practical consequences of determining which of those categories best fits the plaintiff were insignificant in view of the instruction that any one of them was sufficient to support an award of damages to the plaintiff. Foreseeability is a more elastic standard than either of the alternatives, which under the charge required a determination of the mutual intent of both Lang and Sharpe. Their testimony conflicted on whether Sharpe had been told of Lang's intention to sell the property when the land had been approved as a building lot. The jurors may have decided to circumvent the resolution of that issue by choosing the "foreseeable" alternative, on which a unanimous verdict could be more easily obtained.

The most serious flaw in the charge, however, was the failure of the court to instruct the jury that it was the intent of Lang, the promisee, that should determine whether the plaintiff was a third party beneficiary. If Lang's purpose in contracting with the defendants was to fulfill the condition of his agreement with the plaintiff concerning approval of the land as a building lot, the plaintiff was a creditor beneficiary of that contract regardless of whether Lang informed the defendants of his intention to sell the property when he obtained such approval. The plaintiff was also an "intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." 2 Restatement (Second), supra, § 302 (1) (b).

We conclude that the judgment on the breach of contract count of the complaint must be set aside and that the case must be remanded to the trial court for a new trial on that count.

II

STATUTE OF LIMITATIONS

The jury awarded the same amount of damages, $44,074, on the negligence count of the complaint as on the contract count. The defendants, however, had pleaded the defense of the "applicable" statute of limitations, presumably intending to refer to General Statutes § 52-584,[7] which provides that "[n]o action to recover damages for injury . . . to real or personal property, caused by negligence . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of . . . ." The plaintiff does not dispute that the defendants completed their work on or about October 16, 1985, and delivered the site plan to Lang prior to October 23, 1985, when it was approved by the inland wetlands commission. He must have realized that something was wrong with the defendants' performance in the spring of 1986 when his application to the new town sanitarian for a permit in order to begin construction was denied. He has not claimed that he could not have discovered the deficiencies in the work of the defendants if he had exercised reasonable care. This action, therefore, which was brought on September 20, 1989, more than three

---

[7] General Statutes § 52-584 provides: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

years after the completion of the work, is barred by § 52-584, if that statute is applicable.

The plaintiff claims, however, that the appropriate statute of limitations is General Statutes § 52-584a (a),[8] which provides that "[n]o action . . . (1) to recover damages (A) for any deficiency in the design . . . or construction of an improvement to real property . . . shall be brought against any architect or professional engineer performing or furnishing the design . . . or construction of such improvement more than seven years after substantial completion of such improvement." If § 52-584a is applicable, it is indisputable that the plaintiff's action was timely.

In *R.A. Civitello Co.* v. *New Haven*, 6 Conn. App. 212, 222–29, 504 A.2d 542 (1986), this court reviewed the developments in modern tort law relating to the liability of architects and professional engineers who design

---

[8] General Statutes § 52-584a provides: "(a) No action or arbitration, whether in contract, in tort, or otherwise, (1) to recover damages (A) for any deficiency in the design, planning, contract administration, supervision, observation of construction or construction of an improvement to real property; (B) for injury to property, real or personal, arising out of any such deficiency; (C) for injury to the person or for wrongful death arising out of any such deficiency, or (2) for contribution or indemnity which is brought as a result of any such claim for damages shall be brought against any architect or professional engineer performing or furnishing the design, planning, supervision or observation of construction or construction of such improvement more than seven years after substantial completion of such improvement.

"(b) Notwithstanding the provisions of subsection (a) of this section, in the case of such an injury to property or the person or such an injury causing wrongful death, which injury occurred during the seventh year after such substantial completion, an action in tort to recover damages for such an injury or wrongful death may be brought within one year after the date on which such injury occurred, irrespective of the date of death, but in no event may such an action be brought more than eight years after the substantial completion of construction of such an improvement.

"(c) For purposes of subsections (a) and (b) of this section, an improvement to real property shall be considered substantially complete when (1) it is first used by the owner or tenant thereof or (2) it is first available for use after having been completed in accordance with the contract or agreement

buildings or other construction projects and concluded that the result had been "*to extend their liability beyond the date of completion of an improvement to all foreseeable users.*" Id., 225; see *Zapata* v. *Burns*, 207 Conn. 496, 516–17, 542 A.2d 700 (1988). The opinion discusses the background of the model act, adopted with various revisions by thirty states at that time, and concludes that its history indicates that "the model act was drafted not to preempt existing statutes of limitations but to provide these professions additional protection." *R.A. Civitello Co.* v. *New Haven,* supra, 225. The opinion also examines the legislative history of § 52-584a and quotes the remarks of several legislators concerning the need to establish a definite period after completion of a building or project after which the liability of an architect or engineer would terminate. Id., 226–27. The court concluded that § 52-584a "was not intended to give more time than the contract and negligence statutes of limitation may give when applicable, as in the present case. The intent of the seven year statute, and its clear mandate, was to create a seven year absolute maximum on actions against architects and engineers, based upon the finite barrier of substantial completion, regardless of the nature of the claim, *while leaving any other lesser limitations in effect.*" (Emphasis added.) Id., 229. Our Supreme Court in *Zapata* v. *Burns,* supra, 508, adopted this construction of § 52-584a in rejecting constitutional challenges to the statute claiming violations of the equal protection clauses of our state and federal constitutions as well as the open court's provision of our state constitution.

---

covering the improvement, including any agreed changes to the contract or agreement, whichever occurs first.

"(d) The limitation prescribed by this section shall not be asserted by way of defense by any person in actual possession or the control, as owner, tenant or otherwise, of such an improvement at the time any deficiency in such an improvement constitutes the proximate cause of the injury or death for which it is proposed to bring action."

The plaintiff maintains that the plan for the septic sewage system, which the defendants completed prior to October 16, 1985, constitutes an "improvement" to real estate because it enhances the value of the land, regardless of whether the system is ever constructed. One of the several definitions of the word "improvement" is "a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." Webster's Third New International Dictionary. The trial court concluded that "a properly completed site plan for a septic system would enhance or bring into a more valuable or desirable condition (raw land) as something done or added to the subject land that increased its value."

We conclude that a plan or design for a structure cannot constitute the kind of "improvement" contemplated by the legislature in establishing "seven years after substantial completion of such improvement" as the time after which architects and engineers become insulated from claims arising out of their participation in the design of a building or other structure. "Section 52-584a is a statute of repose in that it sets a fixed limit after which the tortfeasor will not be held liable and in some cases will serve to bar an action before it accrues." *Zapata* v. *Burns*, supra, 207 Conn. 508. One legislative purpose in establishing such a limitation was to provide a reasonable period for discovery of any design defects that would not become manifest except through actual use for a reasonable period of time.[9] The legislative scheme to allow seven years for discovery of defects after substantial completion of the improve-

---

[9] "We chose deliberately seven years because we felt if there were going to be any defect in a building it would certainly show up in a seven-year period." 13 H.R. Proc., Pt. 8, 1969 Sess., p. 4005, remarks of Representative Gerard S. Spiegel.

ment for that purpose would be frustrated if that period began to run as soon as the architects and engineers involved in the design of a building or structure have completed their work. Such designs are ordinarily completed long before construction begins and, when different persons or firms participate in the design of various phases of a project, it would be unusual for all of them to complete their work at the same time. Often many years elapse before substantial completion of a large construction project. The seven years allowed by the legislature for the discovery of defects after a structure is in use would be greatly reduced and, possibly, never materialize for some participants in the design work, if that period began when their work was completed. We are not inclined to adopt a construction of the statute that in many instances would defeat a significant purpose for its enactment.

As the defendants requested, the trial court should have instructed the jury that the negligence count of the complaint was barred by the applicable statute of limitations, General Statutes § 52-584, and directed a verdict for the defendants on that count. Accordingly, we order that judgment on the negligence count of the amended complaint be rendered for the defendants.

## III

### RULINGS AT TRIAL

The defendants claim that the trial court abused its discretion (a) by permitting the plaintiff to amend his complaint after the jury had been selected and the trial was to commence and (b) by allowing expert witnesses called by the plaintiff to testify that the defendants had failed to perform the percolation tests properly.

### A

The contract count of the original complaint dated September 18, 1989, alleged that the defendant Sharpe

had breached the contract "by either failing to perform percolation rate tests or by performing said tests improperly." The negligence count alleged that he had been negligent in performing the site plan work in one or more of four specified ways, each of which involved performance of the percolation rate tests. The same allegations were repeated in the first amended complaint, dated May 10, 1991, when the defendant corporation was joined as an additional party.

On May 11, 1995, after the jury had been selected, the plaintiff moved to amend the complaint by adding six additional specifications to the negligence count. Four of these related to deficiencies in the performance of the percolation tests. The other two claimed that the defendants had failed "to follow the proper protocol in completing the site plan in violation of" a specified state regulation and had "designed the septic system in a faulty manner." Over the defendants' objection, the trial court granted the motion to amend, but allowed an additional day for the defendants to investigate the new allegations and to depose one of the plaintiff's expert witnesses.

Because we hold in part II of this opinion that the negligence count is barred by the statute of limitations, § 52-584, it would be an academic exercise to consider whether the trial court, in allowing the amendment, exceeded its broad discretion with respect to such a matter. See *Falby* v. *Zarembski*, 221 Conn. 14, 24, 602 A.2d 1 (1992). Moreover, that issue is not likely to arise at the new trial we have ordered in part I on the contract count. Under the broad allegation of that count that the defendants "breached the contract by either failing to perform percolation rate tests or by performing said tests improperly," any evidence relevant to improper performance of the percolation tests would be admissible, regardless of whether it fits within the specifica-

tions of negligence contained in the negligence count of the amended complaint.

## B

The remaining claims of the defendants relate to rulings allowing the admission of the opinions of two expert witnesses of the plaintiff, Robert Hart and Philip Block, that the defendants had failed to perform the percolation tests with reasonable care. The admissibility of this testimony is likely to arise again at the retrial of the contract count when the plaintiff attempts to prove defective performance of the contract.

The defendants filed a motion in limine to preclude Hart from offering opinions beyond those disclosed in his deposition, which the defendants had taken almost three years before trial. At the deposition, on examination by the defendants, Hart testified initially that he thought that the defendants had performed the percolation tests negligently. His opinion was based on the substantial difference between the results of his own percolation tests on the property and those obtained by the defendants pursuant to the contract with Lang. On further examination by the defendants at the deposition, Hart testified that he would not say that the defendants' tests were performed negligently, but that they were not indicative of what he had found. He remarked that he could not tell whether the person who performed the tests for the defendants had done them negligently because he was not there. He said that he would not testify that the tests were performed in a negligent manner and would say only that the percolation rates he found from his tests in 1987 and 1989 were different from those reported by the defendants from their tests in 1985. The trial court denied the motion to restrict Hart's testimony by excluding his opinion as to whether the defendants had been negligent, opining that the defendants could use any inconsistency to

attack his credibility and that he should be given the opportunity to explain why he had changed his opinion.

We find no abuse of discretion in the trial court's ruling. Hart testified at trial that he had formed the opinion that the percolation tests of the defendants were performed negligently after hearing the testimony of the defendants' employee who had conducted the tests. A witness cannot be prevented from changing his opinion in light of new information he has received. See, e.g., *Kaplan* v. *Mashkin Freight Lines, Inc.*, 146 Conn. 327, 330, 150 A.2d 602 (1959).

The defendants also argue that Block was not qualified to testify as an expert witness because he was not a professional engineer but only a sanitarian. Block testified that he has acted as a sanitarian for various municipalities since 1967. He was trained in biology, physics and the construction of sewage and septic systems. He is familiar with the public health code regulations and the state health department's design manual for on-site sewage disposal systems. He is certified by the state to review septic and sewage disposal plans and, in his work as a sanitarian, he has examined many. He has designed many such systems for professional engineering firms.

The fact that Block did not hold a civil engineering degree or a license as a professional engineer "might properly have affected the weight of his testimony, but not its admissibility." *Conway* v. *American Excavating, Inc.*, 41 Conn. App. 437, 449, 676 A.2d 881 (1996). A trial court has broad discretion in determining the qualifications of an expert and "the exercise of this discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law." *State* v. *Asherman*, 193 Conn. 695, 716, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

The judgment is reversed as to both counts of the complaint that were submitted to the jury and the case is remanded with direction to render judgment for the defendants on the negligence count and for a new trial on the breach of contract count.

In this opinion the other judges concurred.

